UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X
DOW K. BUFORD,

                    Plaintiff,          **MEMORANDUM & ORDER**

          -against-                     12-CV-5751 (KAM)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
---------------------------------------X
**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. § 405(g),[1] plaintiff Dow K.

Buford ("plaintiff") appeals the final decision of defendant

Commissioner of Social Security ("defendant" or the

"Commissioner"), who denied plaintiff's application for

Supplemental Security Income ("SSI") under Title XVI of the

Social Security Act (the "Act").  Plaintiff, proceeding *pro se*,

contends that he is entitled to receive SSI benefits due to a

severe medically determinable impairment, depression, which he

alleges renders him disabled and has prevented him from

performing any work since April 2009.  (*See generally* Compl.)

Presently before the court is defendant's unopposed motion for

judgment on the pleadings, filed on July 17, 2013.  (*See* ECF No.

16, Defendant's Memorandum of Law in Support of Motion for

---
[1] Individuals may seek judicial review in the United States district court for
the judicial district in which they reside of any final decision of the
Commissioner of Social Security rendered after a hearing to which they were a
party, within sixty days after notice of such decision or within such further
time as the Commissioner may allow.  *See* 42 U.S.C. § 405(g).

Judgment on the Pleadings ("Def. Mem.") dated 5/13/2013.)  For the reasons set forth below, defendant's motion is denied and the case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

## I.   Non-Medical Facts

Plaintiff was born on January 16, 1956.  (Tr. 105.)[2] He was fifty-three years old at the alleged onset of disability (April 13, 2009).  (*Id.*)  He is separated from his wife and lives alone in Staten Island, New York.  (Tr. 106.)

Plaintiff has completed the twelfth grade.  (Tr. 129.) He worked delivering newspapers for a newspaper company from January to April 2004.  (Tr. 130.)  From January to December 2007, plaintiff worked as a city park worker in the Parks Department, cleaning the park and bathrooms.  (Tr. 56-57, 130.) Plaintiff did some work for the Parks Department in 2008 and 2009, but stopped because the job was seasonal.  (*See* Tr. 142, 129.)

Plaintiff also writes and recites poetry on occasion; his writing was last published in 2007.  (Tr. 51-55.)  Plaintiff testified that he does not receive compensation for his poetry

---

[2] Citations to the administrative record (1-296) are indicated by the abbreviation "Tr."

writing or performance.  (*Id.*)  From 1983 to 2004, plaintiff sold items on the Staten Island Ferry.  (Tr. 67-68, 146.)

In his day-to-day life, plaintiff makes breakfast, watches television, prepares food, cleans, and does laundry. (Tr. 118-120.)  He speaks on the phone once a week, attends church twice a week, and goes shopping for food and personal items once a month.  (Tr. 120-122.)  Except for those activities, plaintiff has minimal interaction with other people. (*Id.*)  Plaintiff uses public transportation, although he finds it difficult at times.  (Tr. 59, 120.)  Plaintiff has a driver's license but does not use a car because he is "scared to drive." (Tr. 120.)  Primarily during Black History Month, plaintiff recites poetry at conventions and church.  (Tr. 55.)  Plaintiff pays bills, handles a savings account, uses a checkbook or money orders and can count change.  (Tr. 121.)

## II.  Medical Facts

### A. Plaintiff's Testimony Regarding His Symptoms

At his February 28, 2011 hearing, plaintiff testified that he had been hearing voices for eighteen to twenty-four months.  (Tr. 57.)  He described the voices as "listening to an audience of people" (Tr. 67) and similar to "a cafeteria full of people talking.  (Tr. 74.)  Plaintiff testified that he mostly hears the voices at night and that they disrupt his sleep, but that he also sometimes hears the voices during the day.  (Tr.

71-72.)  Plaintiff reported seeing a doctor, Dr. Gamer, since approximately June 2010, and testified that he was taking "Respidol,"[3] which Dr. Gamer had prescribed for him.  (Tr. 59-61.)  He testified that some medication that the doctor had prescribed helps him to sleep.  (Tr. 73.)

Regarding the severity of his symptoms, plaintiff testified: "I try not to go any place I don't have to go, for the most part, because I never know when one of these anxiety attacks, or when these voices, I, [sic] so I try to stay home for the most part unless I have to come out."  (Tr. 64.) Plaintiff also testified that "a lot of times" he has problems with his memory and concentration but that "[i]t's good days and bad days."  (Tr. 66.)  He further testified: "Sometimes, it's like ... I feel like I'm invincible.  And then there's other times where I just ... can't get out of bed."  (*Id.*)

Plaintiff has never been hospitalized in an in-patient program nor had a nervous breakdown requiring that he be taken by EMS to a hospital.  (Tr. 69.)  However, he voluntarily has gone to an emergency room on one occasion when the "voices were bothering [him] so bad."  (Tr. 69-70.)  Plaintiff testified that he was not admitted to the hospital on that occasion, but that the hospital recommended that he see a therapist.  (Tr. 71.)

---

[3] A Disability Form completed by plaintiff indicates that he had been prescribed Risperdal "to calm [his] voices" and Zoloft for depression.  (Tr. 137.)

Plaintiff testified that he suffers no physical pain, was able to walk around the neighborhood, take public transportation, and stand and recite poetry from memory depending on the type of day he is having. (Tr. 62-63.) Plaintiff testified that he does not have thoughts of hurting himself or committing suicide. (Tr. 66-67.) He testified that he does not use drugs or drink alcohol to excess. (Tr. 69.)

In a function report submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations, plaintiff reported having trouble paying attention due to "the noise in my head." (Tr. 123.) He also stated that sudden changes in his schedule confuse him, and that he sometimes has trouble remembering things. (Tr. 124.) Plaintiff noted that he has been less likely to interact with other people since the onset of his condition. (Tr. 122.)

In a Disability Report submitted on appeal, plaintiff stated that, as of June 2010, his depression was more severe and sometimes kept him in bed for three days or more. (Tr. 135; *see* Tr. 138.) He reported visiting the crisis center at Bayley Seton Hospital in Staten Island on June 22, 2010. (Tr. 136; *see* Tr. 200.)

**B. Medical Records Submitted to the ALJ Regarding Plaintiff's Disability**

**1. Consultative Mental Status Examination by Richard King, M.D. (May 28, 2010)**

On May 28, 2010, Dr. King examined plaintiff's psychiatric history and mental health status and dictated his report via telephone to the NYS Division of Disability Determinations. (Tr. 164.) Dr. King stated that plaintiff had no history of psychiatric hospitalizations or consultations, and that plaintiff reported feeling anxious and depressed since his wife left him four years ago. (*Id.*) Plaintiff claimed that he heard noises in his head before going to sleep, but that he did not actually experience overt auditory hallucinations. (*Id.*) At the time of his examination with Dr. King, plaintiff did not have delusions or suicidal ideations, was not taking psychotropic medications, had no prior history of psychiatric treatment, nor any history of alcohol or drug dependence. (Tr. 164-165.)

Plaintiff informed Dr. King that he lives by himself and generally stays at home. (Tr. 165.) He reported being able to perform routine activities of living, including household chores and shopping. (*Id.*) At the time, plaintiff's concentration was adequate. (*Id.*)

Dr. King's mental status examination of plaintiff revealed that he did not suffer from acute distress, engaged in

fair rapport, was cooperative, and had coherent and relevant speech. (Tr. 165.) Dr. King reported that plaintiff's affect was friendly, well-modulated and not significantly anxious, depressed, or inappropriate. (*Id.*) Dr. King also found that plaintiff had fair insight and judgment, average intellectual functioning, clear sensory faculties, and proper orientation to time, place, and person. (*Id.*)

Dr. King suggested that plaintiff "may benefit from psychiatric treatment," that "[p]rognosis is fair with treatment," and that "[i]n [his] opinion, [plaintiff] has a satisfactory ability to follow simple instructions and perform simple tasks and a satisfactory ability to follow complex instructions, perform complex tasks, and interact with coworkers in a work setting." (*Id.*)

Dr. King diagnosed a mild degree of dysthymic disorder[4] on Axis I.[5] (*Id.*)

---

[4] Dysthymic disorder "is a mild but long-term (chronic) form of depression. Symptoms usually last for at least two years, and often for much longer than that. Dysthymia interferes with your ability to function and enjoy life. With dysthymia, you may lose interest in normal daily activities, feel hopeless, lack productivity, and have low self-esteem and an overall feeling of inadequacy. People with dysthymia are often thought of as being overly critical, constantly complaining and incapable of having fun." *See* Mayo Clinic, *Dysthymia* (2012), *available at* http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (last visited November 24, 2015).

[5] Axis I refers to clinical disorders. *See Hernandez v. Astrue*, 814 F. Supp. 2d 168, 174 & n.7 (E.D.N.Y. 2011) (describing diagnostic scale).

## 2. Psychiatric Review Technique Form Completed by N. Shliselberg, M.D. (June 15, 2010)

On June 15, 2010, Dr. Shliselberg reviewed the medical evidence on record from Dr. Dabaghian at Staten Island University Hospital ("SIUH") (see below) and completed a Psychiatric Review Technique ("PRT") Form.[6]  (Tr. 147-160.)  Dr. Shliselberg found that plaintiff had a medically determinable affective disorder[7] that did not satisfy the enumerated diagnostic criteria, and classified it as dysthymic disorder, mild degree.  (Tr. 147, 150.)  As to the "B" criteria of the listings, Dr. Shliselberg found that plaintiff had no functional limitations in the areas of restrictions on activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. (Tr. 157.)  Dr. Shliselberg also found that plaintiff never had experienced repeated episodes of deterioration of extended duration.  (*Id.*)  Dr. Shliselberg did not complete the section of the form pertaining to the "C" criteria of the listings. (Tr. 158.)

---

[6] Regulations require completion of a PRT worksheet by a qualified professional.  *See* 20 C.F.R. § 404.1520a(e)(1) (at the "initial and reconsideration levels of administrative review ... a medical or psychological consultant ... will complete" a PRT Worksheet).

[7] Affective disorder is "characterized by dramatic changes or extremes of mood."  *See* Encyclopaedia Britannica, *Affective disorder* (2014), *available at* http://www.britannica.com/science/affective-disorder (last visited November 24, 2015).

### 3. Treating Relationship with Garbis Dabaghian, M.D.

On June 11, 2010, plaintiff was examined by Dr.
Dabaghian at the Ambulatory Care Clinic of SIUH. (Tr. 278.)
Plaintiff claimed he felt down and had been hearing voices for
two years, as a result of his wife leaving him. (*Id.*) He
reported decreased sleep and diminished interest in activities.
(*Id.*) He was not taking any medications. (*Id.*) He reported
that he had discharge from his right ear, and the examination
showed that he had a ruptured tympanic membrane, or eardrum.
(Tr. 279.) Dr. Dabaghian also found that plaintiff had two
keloids[8] over the anterior chest. (Tr. 278.) Dr. Dabaghian
diagnosed depression. (Tr. 279.) He referred plaintiff to an
ear, nose, and throat specialist to rule out tympanic membrane
perforation and a behavioral health referral to rule out
schizophrenia versus depression. (*Id.*)

On June 17, 2010, plaintiff returned to SIUH and
reported feeling lethargic, irritable, and having difficulty
concentrating. (Tr. 286.) Plaintiff had a flat affect and
depressed mood. (*Id.*) He reported hearing voices a few weeks
prior while he was sleeping. (*Id.*) He denied having a history
of substance abuse or mental health treatment. (*Id.*) Plaintiff

---

[8] A keloid is "a raised area caused by an overgrowth of scar tissue." *See*
Mayo Clinic, *Keloid, available at http://www.mayoclinic.org/keloid/img-
20007748* (last visited November 24, 2015).

was agreeable and motivated for outpatient mental health treatment, and was referred to the Behavioral Health Center at Richmond University Medical Center ("RUMC"), where he registered on June 21, 2010 and received treatment throughout February 2011. (*Id*; *see* Tr. 218-269.)

Plaintiff next visited SIUH on July 16, 2010, when he met with Dr. Dabaghian for a follow-up to receive his blood test results. (Tr. 280-281; *see* Tr. 295-296.) Plaintiff reported feeling better, and Dr. Dabaghian noted that plaintiff was anxious. (Tr. 280.) Dr. Dabaghian diagnosed depression, tinnitus,[9] normocytic anemia,[10] dyslipidemia,[11] increased blood glucose, and high blood pressure. (*Id.*) Dr. Dabaghian noted that plaintiff was following up with a psychotherapist and was

---

[9] Tinnitus is "noise or ringing in the ears. A common problem, tinnitus affects about 1 in 5 people. Tinnitus isn't a condition itself — it's a symptom of an underlying condition, such as age-related hearing loss, ear injury or a circulatory system disorder. Although bothersome, tinnitus usually isn't a sign of something serious. Although it can worsen with age, for many people, tinnitus can improve with treatment. Treating an identified underlying cause sometimes helps. Other treatments reduce or mask the noise, making tinnitus less noticeable." *See* Mayo Clinic, *Tinnitus* (2013), *available at http://www.mayoclinic.org/diseases-conditions/tinnitus/basics/definition/con-2002148*7 (last visited November 24, 2015).

[10] Normochromic normocytic anemia "is a reduction below normal concentrations of red blood cells in which the hemoglobin content and red blood cell size are still normal." *See Morse v. Astrue*, No. 7:06-CV-1417, 2009 WL 1322301, at *10 & n. 11 (N.D.N.Y. May 12, 2009) (citing *Dorland's Illustrated Medical Dictionary* 79-80 (31st ed. 2007).

[11] Dyslipidemia is "a condition marked by abnormal concentrations of lipids or lipoproteins in the blood." *See* Merriam Webster Dictionary, *Dyslipidemia*, *available at* http://www.merriam-webster.com/medical/dyslipidemia (last visited November 24, 2015).

waiting for an appointment with a psychiatrist. (*Id.*) Plaintiff was to continue taking Risperdal and Zoloft. (*Id.*)

On August 19, 2010, plaintiff returned to SIUH for a primary care follow-up. (Tr. 284.) Plaintiff reported that the medication had improved his condition of hearing voices. (*Id.*) He also reported feeling back pain and started taking cholesterol medication. (*Id.*)

On March 22, 2011, plaintiff again met Dr. Dabaghian for a follow-up at SIUH. (Tr. 287.) Dr. Dabaghian noted that plaintiff was to have a follow-up with a psychiatrist regarding a schizoaffective disorder, and that plaintiff was still taking Risperdal and Zoloft, as well as Zocor for hyperlipidemia. (*Id.*) Dr. Dabaghian referred plaintiff to a dermatologist for his keloids. (*Id.*)

### 4. Assessment by Jason Mangiardi, M.D. (June 30, 2010)

On June 30, 2010, Dr. Mangiardi at SIUH saw plaintiff for an ear, nose, and throat evaluation. (Tr. 282-283.) Dr. Mangiardi noted mild tinnitus and vertigo. (Tr. 282.) His examination showed that the external auditory canals were bilaterally clear and the tympanic membranes were intact. (*Id.*) He also assessed normal tympanic membranes bilaterally and he referred plaintiff for a six week sleep study. (Tr. 282-283.)

### 5. Assessment by Wendy Wullbrandt, L.C.S.W. (June 21, 2010)

On June 21, 2010, plaintiff visited RUMC's Behavioral Health Center after reporting hearing voices to his primary care physician. (*See* Tr. 220.) Wendy Wullbrandt, L.C.S.W., conducted an assessment of plaintiff at RUMC. (Tr. 220; *see also* Tr. 229-33.) Plaintiff reported hearing voices in the evening and sometimes during the day, and that they were getting more frequent to the point that he could no longer tolerate it. (*Id.*) He also reported being depressed. (*Id.*) Plaintiff said he last worked in 2007 and that he was unable to find work and had stopped looking because he had given up hope. (*Id.*) He reported that he had spent two to three days in bed the previous month, had decreased appetite, low energy, low motivation, anxiety, nervousness, and sleep disturbance. (*Id.*) He denied suicidal and homicidal ideations. (*Id.*) He reported that the voices sounded like "many people talking, as though he were in a crowded lunch room or auditorium," but denied experiencing command hallucinations. (*Id.*) He said that, at times, he would not hear the voices for two to three days, then hear them daily for the next few days. (*Id.*)

Ms. Wullbrandt found plaintiff to be "dressed casually and very neatly with excellent hygiene" and to have a "cooperative attitude and good eye contact." (Tr. 222.) He was

also found to have a euthymic,[12] depressed mood, a full range of
affect, and fair insight and judgment.  (Tr. 223.)

Ms. Wullbrandt diagnosed plaintiff with depressive
disorder, not otherwise specified, on Axis I, and found a global
assessment of functioning (GAF) score of 55.[13]  (*Id.*)  She
referred him to the St. George Clinic for diagnosis, monthly
evaluation, medication, and individual and group therapy.  (Tr.
224.)  She further advised plaintiff to visit the hospital's
Comprehensive Psychiatric Emergency Program (CPEP) for
evaluation of his depression and hearing voices, as well as to
begin medication.  (*Id.*)

### 6. Assessment by Archna Sarwal, M.D. (June 22, 2010)

On June 22, 2010, plaintiff visited RUMC's CPEP to
receive medication, as he did not have an intake appointment
with the outpatient clinic until August 2, 2010.  (Tr. 208.)
Dr. Sarwal conducted a psychiatric assessment on plaintiff.
(Tr. 208.)  Plaintiff reported to Dr. Sarwal that he had a long
history of depressed mood, which had increased in the past year,
and that he had been hearing voices, which were unclear, kept

---

[12] A euthymic mood is "[m]ood in the 'normal' range, which implies the absence
of depressed or elevated mood."  *See* Healthdictionary.info, *Euthymic*,
*available at* http://www.healthdictionary.info/Euthymic.htm (last visited
November 24, 2015).

[13] "GAF rates overall psychological functioning on a scale of 0-100 that takes
into account psychological, social, and occupational functioning."  *Zabala v.
Astrue*, 595 F.3d 402, 411 & n. 1 (2d Cir. 2010).

him up at night, and did not contain any command auditory hallucinations.  (*Id.*)  Plaintiff's primary care doctor had told plaintiff during a June 11, 2010 appointment that his right ear drum was ruptured, but plaintiff did not believe that the voices he was hearing were a result of the rupture.  (*Id.*)  Plaintiff further reported anhedonia, or an inability to feel pleasure, poor appetite, self-isolation, and an inability to get out of bed for three days the previous month.  (*Id.*)  Plaintiff told Dr. Sarwal that he had received a CT scan of his head at SIUH on June 2, 2010, which was negative.  (*Id.*)

Dr. Sarwal found that plaintiff had a cooperative attitude, good eye contact, depressed mood, constricted affect and fair insight and judgment.  (Tr. 210.)  Dr. Sarwal diagnosed major depression[14] (single episode, moderate) and rule-out[15] major depression with psychosis.  (Tr. 211.)  She assessed plaintiff's GAF score as 55, prescribed Risperdal and Zoloft, and referred

---

[14] Major depressive disorder, also known as depression, is "a mood disorder that causes a persistent feeling of sadness and loss of interest. Also called major depression ... or clinical depression, it affects how you feel, think and behave and can lead to a variety of emotional and physical problems. You may have trouble doing normal day-to-day activities, and depression may make you feel as if life isn't worth living."  *See* Mayo Clinic, *Depression* (2015), *available at* http://www.mayoclinic.org/diseases-conditions/depression/basics/definition/con-20032977?utm_source=Google&utm_medium=abstract&utm_content=Major-depression&utm_campaign=Knowledge-panel (last visited November 24, 2015).

[15] Rule-out is a term used by medical professionals to mean "eliminate or exclude something from consideration."  *See* MedicineNet, *Definition of Rule out* (2012), *available at* http://www.medicinenet.com/script/main/art.asp?articlekey=33831 (last visited November 24, 2015).

plaintiff for an aftercare appointment at the St. George Adult Outpatient Clinic with Jacqueline Szoychen.  (Tr. 211, 214, 216.)

### 7. **Treating Relationship with Jacqueline Szoychen, L.M.S.W.**

After his discharge from the CPEP, plaintiff began seeing Jacqueline Szoychen, L.M.S.W., on a biweekly basis beginning on August 4, 2010.  (Tr. 234; *see* Tr. 171.)  In her initial assessment of plaintiff, Ms. Szoychen reported that plaintiff had not experienced true friendship, which he attributed to his need for isolation and fear of hearing voices while outside.  (*Id.*)  Plaintiff said that his depression was in direct relation to the voices and that, although the deep depression "comes and goes," he always feels depressed.  (*Id.*)  Ms. Szoychen diagnosed plaintiff with depressive disorder, not otherwise specified, rule-out depression with psychotic features, and rule-out mood disorder due to medical condition on Axis I.  (Tr. 238.)  She determined plaintiff's GAF to be 55.  (*Id.*)  Ms. Szoychen recommended weekly therapy, a psychiatric evaluation with Dr. Sevil Gamer, which was scheduled for August 16, 2010, and medication management.  (Tr. 235.)

Ms. Szoychen also held a forty-five minute psychotherapy session with plaintiff on August 4, 2010.  (Tr. 241.)  Plaintiff spoke about his difficulty sleeping and about hearing voices.  (*Id.*)  He presented as depressed and had poor

eye contact, but was alert and displayed no psychomotor dysfunction. (*Id.*) Plaintiff was cooperative, outspoken, appropriately dressed and nourished, oriented to person, place, and time, and displayed normal speech and thought patterns. (*Id.*) Ms. Szoychen found that plaintiff met "medical necessity due to perseverance of symptoms interfering on functioning" and set up an appointment for the following week. (*Id.*)

On August 11, 2010, plaintiff returned to Ms. Szoychen for a thirty-minute psychotherapy session. (Tr. 241.) He did not report hallucinations or delusions. (*Id.*) Plaintiff demonstrated no progress with his symptoms. (*Id.*) Ms. Szyochen discussed coping skills with plaintiff and encouraged him to go to the emergency room after he reported running out of medication. (*Id.*)

Plaintiff met with Ms. Szoychen again on August 25, 2010. (Tr. 243-244.) He reported feeling disappointed that he was still hearing voices despite taking medications prescribed by the psychiatrist for a week. (*Id.*) He reported no hallucinations and delusions but reported persistent, non-commanding murmurs in his head. (*Id.*) Ms. Szoychen discussed coping mechanisms and medication with plaintiff, including explaining the timeframe for the medication's effectiveness, and also provided plaintiff with homework to practice thought management skills. (*Id.*)

On October 19, 2010, plaintiff visited Ms. Szoychen and reported improved symptoms but persistent isolation. (Tr. 245.) He reported no hallucinations and delusions but continued to hear the voices in his head. (*Id.*) Ms. Szoychen and plaintiff discussed plaintiff's concerns about "preference to isolate as a symtom [sic] of depression." (*Id.*)

On November 1, 2010, after seeing Dr. Gamer, as discussed further below, plaintiff met with Ms. Szoychen for thirty minutes. (Tr. 247.) He reported an increased ability to concentrate and spoke about his relationship with his daughter. (*Id.*) He reported that he continued to hear voices. (*Id.*) They discussed his improvement, and Ms. Szoychen educated plaintiff about the positive effect that could have on his relationships. (*Id.*)

Ms. Szoychen again treated plaintiff on November 15, 2010. (Tr. 248.) He spoke about spending the upcoming Thanksgiving with his family. (*Id.*) He mentioned the persistent voices. (*Id.*) Ms. Szoychen and plaintiff discussed the pros and cons of being in a group, and Ms. Szoychen praised plaintiff's consideration of an end to his isolation. (*Id.*) Ms. Szoychen reported that plaintiff demonstrated progress by considering discontinuing his isolation as a skill against depression. (*Id.*)

On November 29, 2010, plaintiff visited Ms. Szoychen for a psychotherapy session. (Tr. 247.) Still hearing voices, plaintiff expressed concerns that he would never get better. (*Id.*) Ms. Szoychen educated plaintiff about the healing process. (*Id.*) On December 13, 2010, plaintiff met with Ms. Szoychen after a visit with Dr. Gamer. (Tr. 249-250.) He expressed concern about spending another holiday alone. (*Id.*) At the time of his session, he was still hearing voices. (Tr. 250.) Ms. Szoychen reported that plaintiff was able to identify possible coping skills. (*Id.*)

Plaintiff's next session with Ms. Szoychen was on January 10, 2011. (Tr. 250.) He expressed concerned about forced isolation due to his illness and the separation it created with his family. (*Id.*) On January 24, 2011, plaintiff again reported concerns that he would never get better. (Tr. 252.) On February 9, 2011, plaintiff discussed his attempts to eat healthier after being diagnosed with high cholesterol. (Tr. 252.) Ms. Szoychen indicated that plaintiff presented as less depressed. (*Id.*) Throughout these visits, plaintiff continued to report hearing voices. (*See* Tr. 250, 252.)

Ms. Szoychen provided several letters confirming plaintiff's diagnoses by treatment providers at the St. George Clinic at RUMC. (*See* Tr. 171-173.) A letter dated August 11, 2010 indicated that plaintiff's initial diagnosis was depressive

18

disorder with psychotic features.  (Tr. 171.)  A letter dated November 15, 2010 reported that plaintiff had reported improved mood and sleep, that his auditory hallucinations were much less in intensity, and that the medication was making him feel better.  (Tr. 173.)  Plaintiff's diagnoses as of November 15, 2010 were depressive disorder not otherwise specified, psychotic disorder not otherwise specified, rule-out depression with psychotic features, and rule-out mood disorder due to medical conditions.  (*Id.*)  The treatment progress states that plaintiff had regained some concentration abilities and that his attention span had improved.  (*Id.*)  Nonetheless, plaintiff still heard voices and was unable to conquer his disability in a social environment.  (*Id.*)

In a letter dated January 10, 2010 (but apparently misdated and subsequently stamped with a date of March 8, 2011),[16] Ms. Szoychen reported that plaintiff said his mood and sleep were improved and that his auditory hallucinations were much less in intensity, and that he felt better.  (Tr. 172.) Plaintiff said he seldom heard them anymore and that the medication was working.  (*Id.*)  His diagnosis was unchanged from August 2010.  (*Id.*; *see* Tr. 171.)  The treatment progress notes stated that plaintiff had complied with treatment so far and

---

[16] As the body of the letter indicates, plaintiff was not in treatment at RUMC until August 2010.  (*See* Tr. 172.)

regained some of his concentration abilities and that his attention span had improved. (*Id.*) Plaintiff still heard voices and was unable to conquer his social dysfunction. (*Id.*)

### 8. Treating Relationship with Sevil Gamer, M.D.

In conjunction with his therapy sessions, plaintiff began to see with Dr. Gamer, a psychiatrist, for medication management appointments. At his initial evaluation on August 16, 2010, plaintiff reported hearing voices starting a year prior to his visit but could not identify a stressor that caused the voices. (Tr. 241-42.) He described the voices as those from a crowded place like a stadium. (*Id.*) Plaintiff stated that he could not understand words from the voices and that they mainly occurred at nighttime. (*Id.*) He said he felt depressed for one to one-and-a-half years, sometimes stayed in bed all day, and had a poor appetite. (*Id.*) Plaintiff said he felt the voices were adding to his depression, and his depression was adding to the voices. (*Id.*) He said he had low energy and no motivation, and felt helpless but not hopeless. (*Id.*) He denied symptoms of mania, anxiety, and drug use and denied major medical or legal problems. (*Id.*) Plaintiff had begun taking 0.5 mg of Risperdal daily and 50 mg of Zoloft daily in June 2010 and said that he felt better since he started taking the medication because the voices became quieter and he had more energy. (*Id.*)

In his evaluation of plaintiff's mental state
evaluation, Dr. Gamer found plaintiff cooperative and his mood
and affect depressed.  (Tr. 243.)  Dr. Gamer found no paranoia
or delusion, and that plaintiff had fair attention,
concentration, and memory.  (*Id.*)  Dr. Gamer diagnosed plaintiff
with depressive disorder not otherwise specified and psychotic
disorder not otherwise specified.  (*Id.*)  He also noted "rule-
out" depression with psychotic features and mood disorder due to
medical condition.  (*Id.*)  His GAF was 58.  (*Id.*)  Plaintiff was
given a treatment plan of medication and weekly therapy.  (*Id.*)

On September 21, 2010, plaintiff reported that he
continued to hear unintelligible voices, mainly at nighttime.
(Tr. 244.)  He said that the voices frightened him and that he
would stay home and isolate himself as a result.  (*Id.*)
Plaintiff insisted that Dr. Gamer not obtain collateral
information from his friends and family.  (*Id.*)  Plaintiff also
reported his participation in a support program that was going
to require a psychiatric evaluation.  (*Id.*)  Dr. Gamer noted
finding this "suspicious" because plaintiff had just started
seeing a psychiatrist for the first time in his life and did not
want any collateral information obtained.  (*Id.*)  Dr. Gamer's
mental state evaluation reported plaintiff as cooperative with
fair eye contact, a sometimes depressed mood, a dysthymic
affect, and no paranoia or delusions.  (*Id.*)  Dr. Gamer assessed

plaintiff's attention, concentration, and memory as fair. (*Id.*)
He noted that a head CT scan was normal and blood work revealed
abnormal lipids. (*Id.*) Dr. Gamer's diagnosis remained the same
and he increased plaintiff's dosage of Risperdal and Zoloft.
(Tr. 245.)

On November 1, 2010, plaintiff had a medication
management appointment with Dr. Gamer. (Tr. 246-247.) Dr.
Gamer found that plaintiff had good eye contact and was verbose.
(Tr. 246.) Plaintiff reported that his mood and sleeping had
improved and that the voices he heard were much reduced in
intensity and lower in frequency. (*Id.*) Plaintiff discussed
and was preoccupied with his financial problems. (*Id.*) He said
that he still did not want collateral information obtained
because he did not disclose his psychiatric treatment to his
family. (*Id.*) Dr. Gamer found that plaintiff was cooperative,
had good eye contact, and that his mood was better and less
depressed. (*Id.*) His affect was euthymic, or within a normal
range. (*Id.*) Plaintiff's attention, concentration, and memory
were fair. (*Id.*) Dr. Gamer's diagnosis remained the same.
(Tr. 246-247.)

Plaintiff's next appointment with Dr. Gamer was on
December 13, 2010. (Tr. 248-249.) Plaintiff had good eye
contact and was verbose. (Tr. 248.) He reported feeling down
because it was the time of year when people are together with

their families.  (*Id.*)  Plaintiff said the voices were less frequent and not as loud, and wondered if they would ever go away.  (*Id.*)  Plaintiff was provided support and education about the small possibility that he might hear voices for the rest of his life and was receptive to that information.  (*Id.*)  Dr. Gamer's diagnosis remained unchanged.  (Tr. 249.)

During his January 24, 2011 visit, plaintiff told Dr. Gamer that he had applied for SSI at the same time he was referred to the clinic.  (Tr. 251.)  Plaintiff said that he had good and bad days, but more good days than bad days compared to when he started treatment.  (*Id.*)  He reported experiencing interrupted sleep for six to eight hours a night.  (*Id.*)  His appetite was good.  (*Id.*)  The voices in his head were less frequent but still present, and continued to occur more often at night than during the day.  (*Id.*)  Dr. Gamer's mental state evaluation and diagnosis were the same as in his previous two appointments.  (*Id*; *see* Tr. 249, 247.)

On February 28, 2011, plaintiff again met with Dr. Gamer.  (Tr. 252-254.)  Plaintiff reported feeling nervous because he had been in court for a hearing regarding his SSI application.  (Tr. 253.)  He said that the questions he was asked made him anxious and that he took an extra Zoloft when he returned home and felt more calm as a result.  (*Id.*)  Dr. Gamer found this unusual because Zoloft does not work at the time of

consumption; rather, the therapeutic effect takes longer. (*Id.*)
Dr. Gamer also indicated that Zoloft's immediate effect could be
to increase restlessness, but that plaintiff did not have
increased restlessness. (*Id.*) Plaintiff requested that Dr.
Gamer send the judge information so that he could receive SSI.
(*Id.*) Plaintiff reported that he continued to hear voices, that
he had poor sleep and woke up a few times at night, and avoided
going out into public. (*Id.*) Plaintiff continued to endorse
the same complaints, and Dr. Gamer reported: "Apparently
[plaintiff] is not improving, as per his report, since treatment
started in August 2010." (*Id.*) Dr. Gamer questioned if
plaintiff had any secondary gain, and again noted that plaintiff
did not provide any contact information for collateral
information, which would be necessary to clarify plaintiff's
level of functioning and social activities. (*Id.*) Dr. Gamer
found that plaintiff was providing evasive information regarding
his contact with this family. (*Id.*) Dr. Gamer suggested a
trial with Trazodone to help plaintiff's sleep schedule, to
which plaintiff agreed. (*Id.*) His diagnosis was unchanged, but
Dr. Gamer also noted "rule-out" malingering at this appointment.
(*Id.*; *see* Tr. 251, 249, 247.)

### 9. Treatment Plans Completed by Santapuri Rao, M.D.

On August 4, 2010, the date of plaintiff's intake
appointment with the Outpatient Clinic, Dr. Rao entered a

comprehensive treatment plan for plaintiff. (Tr. 238.)
Plaintiff's initial diagnosis was depressive disorder not
otherwise specified. (*Id.*) Dr. Rao noted rule-out depression
with psychotic features and mood disorder due to medical
condition. (*Id.*) His GAF was 55. (*Id.*) The discharge
criteria reports that plaintiff wanted to eliminate the voices
he was hearing, and that the voices were related to his
depression. (*Id.*) Individual, weekly psychotherapy evaluations
and medication management were prescribed for plaintiff. (*Id.*)

On November 11, 2010, Dr. Rao updated plaintiff's
treatment plan. (Tr. 237.) The diagnosis was updated to
include depressive disorder not otherwise specified, rule-out
depression with psychotic features, and rule-out malingering.
(*Id.*) Plaintiff's GAF was assessed at 58, where it had
previously been 55. (*Id.*) Plaintiff declined collateral
participation in his treatment plan. (*Id.*) Progress was
reported as slow, and more work was found necessary. (*Id.*)
Plaintiff was found to experience depression and the reported
goal was for plaintiff to experience six months without
depression and identify triggers for his depression. (*Id.*)
Individual, weekly psychotherapy evaluations and medication
management were prescribed for plaintiff. (*Id.*)

### 10. **Biopsychosocial Assessment by Robin Kaynor (August 17, 2010)**

On August 17, 2010, Robin Kaynor, a social worker at the FEGS nonprofit organization, completed a bio-psychosocial assessment of plaintiff. (Tr. 176-186.) Plaintiff reported that he was last employed in 2007 as a landscaper for the NYC Parks Department. (Tr. 180.) The assessment indicates that plaintiff was "not interested in working." (*Id.*) Plaintiff reported that he had been receiving treatment at RUMC for two months, in the form of biweekly therapy and medication, for depressive disorder with psychotic features. (Tr. 183.) Plaintiff presented medical documentation of his diagnosis. (Tr. 185, 186.)

Plaintiff reported hearing auditory hallucinations, as recently as a few nights prior to his evaluation, while trying to sleep and described it as chatter, like multiple people speaking at a baseball game. (Tr. 183.) He had never experienced command auditory hallucinations. (*Id.*) Plaintiff denied current visual and auditory hallucinations. (*Id.*) Plaintiff reported that, more than half of the time, he felt down, depressed, or bad about himself, and that he was a failure or that he had let himself or his family down. (Tr. 183-184.) Plaintiff reported that, for several days, he had little interest or pleasure in doing things, felt tired or had little

energy, had a poor appetite or overate, and had trouble concentrating. (Tr. 184.) He reported that he never moved or spoke so slowly or was so fidgety that others noticed, and that he never felt that he would be better off dead or hurting himself. (*Id.*)

Plaintiff received a PHQ-9 Score of 9, which resulted in a depression severity classification of mild.[17] (*Id.*) Plaintiff reported that he had travel limitations due to his discomfort around others, and that he had traveled to the appointment by public transportation. (Tr. 185.) With respect to his daily activities, plaintiff reported that he spent his days at home and was able to wash clothes, sweep and mop the floor, vacuum, shop for groceries, and cook meals. (*Id.*)

Ms. Kaynor found that plaintiff's appearance and attire were appropriate and that he interacted appropriately with others. (Tr. 185.) Regarding psychosocial barriers to employment, Ms. Kaynor noted that plaintiff considered his discomfort around others as presenting a barrier to employment and a limitation on his transportation options. (Tr. 185-186.)

---

[17] The PHQ-9 test, or Patient Health Questionnaire-9 test, relies on patient self-assessment and "is used as a screening device for psychological impairments based on DSM-IV symptom criteria and ranked on a scale of severity." *See Hernandez*, 814 F. Supp. 2d 168, 174 & n.8.

### 11. Examinations by Rose Chan, M.D. (August 30, 2010)

On August 30, 2010, Dr. Chan, a physician affiliated with FEGS, examined plaintiff. (Tr. 188-192.) Plaintiff reported that he had been seeing a psychiatrist for depression since June 2010. (Tr. 188.) He reported that his condition had improved with his medication regimen (Risperdal, Zoloft, and a medication to manage his cholesterol), with which he was compliant, but that he occasionally heard voices. (Tr. 188-189.) He reported no vegetative symptoms, that he last worked for the Parks Department in 2007, but that he wanted to remain indoors and did not feel ready to work. (Tr. 188.) Plaintiff reported that his mood was improved and he most recently heard voices three nights ago, although the voices were unclear. (Tr. 190.) Plaintiff reported no intent to harm himself or others. (*Id.*) Dr. Chan found that plaintiff had abnormal mood and affect, appeared depressed, was clear and cooperative, and had no intent to harm himself. (Tr. 191.)

On September 14, 2010, Dr. Chan noted that plaintiff had major depressive disorder with psychotic features and was "unstable to work." (Tr. 193.) Dr. Chan diagnosed plaintiff with dyslipidemia and major depressive disorder with psychotic features. (*Id.*) Regarding his employment disposition, Dr. Chan found that plaintiff had an unstable medical and/or mental health condition that required treatment before a functional

capacity outcome could be made. (*Id.*) Dr. Chan found that plaintiff had no physical barriers to work and no intent to harm himself, but that he was not ready to work and needed psychiatric care for major depressive disorder with psychotic features. (*Id.*)

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits on May 10, 2010, alleging that he was disabled since April 13, 2009. (Tr. 105.) Plaintiff alleged worsening depression that keeps him in bed "for 3 days or more" on a Disability Report. (Tr. 135.) On June 16, 2010, plaintiff's application was denied. (Tr. 77.) On June 30, 2010, plaintiff requested a hearing before an administrative law judge, which took place before ALJ Robert C. Dorf (the "ALJ") on February 28, 2011. (Tr. 37-75, 81.) At the hearing, plaintiff testified about his employment history, his alleged mental impairments, the type and severity of his symptoms, his treatment history, as well as his daily routine and ability to travel and interact with others. (Tr. 49-74.) On May 6, 2011, the ALJ found that plaintiff was not disabled pursuant to the five-step evaluation process for determining whether an individual is disabled. (Tr. 10-16; *see* 20 C.R.F. 404.1520(a).)

At step one of the analysis, the ALJ found that plaintiff had "not engaged in substantial gainful activity since

May 10, 2010, the application date." (Tr. 12.)  With respect to

step two, the ALJ found that plaintiff had a severe impairment,

depression, that had "more than a minimal effect on his ability

to perform work-related functions."  (*Id.*)

Regarding step three, the ALJ found that plaintiff

"does not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments in 20

CFR Part 404, Subpart A, Appendix 1 (20 CFR 416.920(d), 416.925

and 416.926)."  (*Id.*)  The ALJ found that claimant's impairments

did not meet or medically equal the criteria under "paragraph B"

of listing 12.04.[18]  (*Id.*)  *See* 20 C.F.R. Pt. 404, Subpt. P, App.

1.  Specifically, the ALJ found plaintiff suffered only a mild

restriction on activities of daily living, mild difficulties in

maintaining social functioning, moderate difficulties in

maintaining concentration, persistence or pace, and no episodes

of decompensation.  Also at step three of the analysis, the ALJ

---

[18] 20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.04 relates to Affective Disorders,
"[c]haracterized by a disturbance of mood, accompanied by a full or partial
manic or depressive syndrome.  Mood refers to a prolonged emotion that colors
the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the
requirements in both A and B are satisfied, or when the requirements in C are
satisfied."  Depressive syndrome, from which the ALJ found that plaintiff
suffered, is one of the conditions enumerated under paragraph A.  Paragraph B
requires that the condition result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace;
   or
4. Repeated episodes of decompensation, each of extended duration.

found that plaintiff did not meet the criteria required under "paragraph C" of listing 12.04,[19] but did not specify to which criteria he referred.  (Tr. 13-14.)

Under step four of the analysis, the ALJ found that plaintiff has the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but with the following nonexertional limitations: he has the ability to follow simple instructions and perform simple tasks.  He can interact with co-workers in a routine work setting."  (Tr. 14.) The ALJ explained that his finding was based on the scarcity of objective medical evidence in the record.  (Tr. 15-16.)  The ALJ also noted that plaintiff's testimony at the hearing regarding his reason for ending work was inconsistent with evidence in the record, which indicated that plaintiff had ceased work because his job was seasonal.  (*Id.*; *see* Tr. 142, 129.)

Finally, at step five, the ALJ found that plaintiff was capable of performing past relevant work as a city park

---

[19] Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

worker and that this work did not require the performance of
work-related activities precluded by plaintiff's RFC.  (Tr. 16.)

When the Appeals Council denied plaintiff's request
for review of the ALJ's decision on September 28, 2012, the
ALJ's decision became the final decision of the Commissioner.
(Tr. 1.)  Plaintiff filed the instant complaint on January 10,
2013.  (ECF No. 1.)  The Commissioner served its motion for
judgment on the pleadings and filed the motion with the court on
July 7, 2013.  (ECF No. 16, Def. Mem.)  Plaintiff is proceeding
*pro se* and did not file an opposition, despite having been
served with notice of the Commissioner's motion on May 13, 2013.
(ECF No. 12; *see generally* Docket No. 12-cv-5751.)

## DISCUSSION

## I.   Standard of Review

The reviewing court does not review *de novo* the
Commissioner's determination of whether a claimant is disabled.
*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  Instead,
the reviewing court assesses:  (i) whether proper legal
standards for disability determination were applied, and (ii)
whether substantial evidence supports the findings of fact.  *Id*;
*Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984).  The
decision must stand if the Commissioner's decision applies the
correct legal standards and is supported by substantial

evidence. *See Mullings v. Colvin*, No. 13-cv-1705, 2014 WL
6632483, at *11 (E.D.N.Y. Nov. 21, 2014).

The reviewing court must be certain that the ALJ
considered all the evidence when assessing the legal standards
and evidentiary support used by the ALJ in his disability
finding. *See* 42 U.S.C. § 405(g) ("[t]he court shall have power
to enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security with or without remanding the
cause for a rehearing."). The reviewing court is authorized to
remand the Commissioner's decision to allow the ALJ to further
develop the record, make more specific findings, or clarify his
rationale. *See Grace v. Astrue,* No. 11-cv-9162, 2013 WL
4010271, at *14 (S.D.N.Y. July 1, 2013); *see also Butts v.
Barnhart,* 388 F.3d 377, 385-86 (2d Cir. 2004) ("where the
administrative record contains gaps, remand to the Commissioner
for further development of the evidence is appropriate.").

## II.  **Legal Standards Governing Agency Determinations of Disability**

### A. Determining Disability Through the Five-Step Evaluation

To receive disability benefits, a claimant must become
disabled while he still meets the insured status requirements of
the Social Security Act and the regulations promulgated by the
Social Security Administration ("SSA"). *Arnone v. Bowen*, 882

F.2d 34, 37-38 (2d Cir. 1989).  The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled, the Commissioner uses a "five-step sequential evaluation."  20 C.F.R. § 404.1520; *see Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (describing the five-step process).  If at any step of the five-step sequence the Commissioner can determine that a claimant is or is not disabled, the evaluation stops at that step and the Commissioner issues his decision; if the Commissioner is unable to make a determination at any step, the sequence continues to the next step.  20 C.F.R. § 404.1520(a)(4).

Step one requires the Commissioner to determine whether the claimant is currently engaged in substantial gainful employment.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is engaged in substantial gainful employment, he is not disabled "regardless of [his] medical condition."  20 C.F.R. § 404.1520(b).  Otherwise, the Commission moves to step two.  20 C.F.R. § 404.1520(a)(4)(ii).

At step two, the Commissioner determines whether the claimant has a "severe medically determinable physical or mental impairment." *Id.* If the claimant purports to have a mental impairment, the Commissioner must apply a "special technique" to determine the severity of that mental impairment. 20 C.F.R. § 404.1520a; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (describing analysis). The special technique, discussed in further detail below, should be applied at "the second and third steps of the five-step framework." *Kohler*, 546 F.3d at 266.

If the medical impairment is medically severe, the sequence moves on to step three, in which the Commissioner compares the claimant's impairment to a listing of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment "meets or equals" one of the listed impairments, he is per se disabled irrespective of his "age, education, and work experience," and the sequential evaluation stops. 20 C.F.R. § 404.1520(d).

If the claimant is not per se disabled under step three, the Commissioner must determine the claimant's RFC before moving to step four. 20 C.F.R. § 404.1520(e). RFC is defined as an individual's ability to do physical and mental work activities on a sustained basis despite limitations imposed by his impairment. 20 C.F.R. 404.1545(a)(1). To determine a claimant's RFC, the Commissioner is to consider "all of the

relevant medical evidence," in addition to descriptions and observations by non-medical sources, like the claimant's friends and family.  20 C.F.R. 404.1545(a)(3).

When the Commissioner's RFC determination relies on plaintiff's own statements with respect to his symptoms, the Commissioner must follow a two-step process for determining the credibility of those statements.  20 C.F.R. § 416.929(c)(3).

First, the "adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) ... that could reasonably be expected to produce the individual's symptoms ...."  Second, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ...."  *Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *9-11 (E.D.N.Y. Mar. 17, 2013) (internal quotation omitted).

Upon determining a claimant's RFC, the Commissioner proceeds to step four, at which point the Commissioner determines whether the claimant's RFC is sufficient to perform his "past relevant work," which is defined as substantial gainful activity that the claimant has performed within the past fifteen years.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b)(1).  If the Commissioner finds that the claimant can

perform his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(f). Otherwise, the Commissioner must move to step five to determine whether the claimant can make "an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

At step five, the Commissioner employs his prior RFC finding in conjunction with the claimant's "vocational factors" (i.e., age, education, and work experience) to determine whether the claimant can transition to another job that is prevalent in the national economy. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c)(1). Under step five, the Commissioner's burden is limited to providing "evidence that demonstrates that other work exists in significant numbers in the national economy that" the claimant can do in light of his RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2). If the Commissioner finds that the claimant cannot transition to another job prevalent in the national economy, the claimant is disabled. *See* 20 C.F.R. § 404.1520(g)(1).

## B. The "Special Technique" for Mental Impairments

As referenced above, under steps two and three of the five-step sequence for determining a claimant's eligibility for disability benefits under 20 C.F.R. §§ 404.1520 and 416.920, the SSA requires the use of a "special technique" to evaluate the severity of mental impairments. *Kohler*, 546 F.3d at 266. The special technique requires:

the reviewing authority to determine first whether the
claimant has a medically determinable mental
impairment, [and if] there is such impairment, the
reviewing authority must rate the degree of functional
limitation resulting from the impairment(s) in
accordance with paragraph C of the regulations, which
specifies four broad functional areas: (1) activities
of daily living; (2) social functioning; (3)
concentration, persistence, or pace; and (4) episodes
of decompensation.

*Id.; see also* 20 C.F.R. §§ 404.1520a(b)-(c), 416.920a(b)-(c).

"[I]f the degree of limitation in each of the first
three areas is rated 'mild' or better, and no episodes of
decompensation are identified ... the reviewing authority ...
will conclude that the claimant's mental impairment is not
'severe' and will deny benefits." *Kohler,* 546 F.3d at 266
(citing 20 C.F.R. § 404.1520a(d)(1)). However, if the
claimant's mental impairment or combination of impairments is
severe, "in order to determine whether the impairment meets or
is equivalent in severity to any listed mental disorder," the
reviewing authority must "first compare the relevant medical
findings [as well as] the functional limitation rating to the
criteria of listed mental disorders." *Id.* (citing 20 C.F.R. §
404.1520a(d)(2)). If the mental impairment is equally severe to
a listed mental disorder, the claimant will be found to be
disabled. *Id.* "If not, the reviewing authority [must then]
assess" the plaintiff's RFC. *Id.* (citing 20 C.F.R. §
404.1520a(d)(3)). Because it is the ALJ's duty to develop the

record, the application of this process must be documented at the "initial and reconsideration levels of administrative review," when "a medical or psychological consultant ... will complete" a Psychiatric Review Technique Form. *Id.* (citing 20 C.F.R. § 404.1520a(e)(1)).

## C. Assessing Plaintiff's Credibility

A claimant's statements of his symptoms such as pain cannot alone serve as conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A)); *see Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208, at *13 (E.D.N.Y. Dec. 9, 2010). Instead, the ALJ must consider "the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citation and quotation marks omitted).

The regulations prescribe a two-step process to evaluate a claimant's assertions about his symptoms. *See id.* In the first step, the ALJ determines if a claimant has a medically determinable impairment that "could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If such an impairment exists, the ALJ must then determine "'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence'" in the

administrative record.  *Id.* (quoting 20 C.F.R. § 404.1529(a));
*see also Brown v. Astrue*, No. 08-CV-3653, 2010 WL 2606477, at *6
(E.D.N.Y. June 22, 2010) ("If the ALJ finds such impairments, he
then evaluates the intensity and persistence of the symptoms to
determine how they limit the claimant's functioning.")

If the claimant makes "statements about her symptoms
that are not substantiated by objective medical evidence, the
ALJ must make a finding as to the claimant's credibility."
*Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009)
(internal citations and quotation marks omitted).  Because an
ALJ has "the benefit of directly observing a claimant's demeanor
and other indicia of credibility," his decision to discredit
subjective testimony must be upheld on review if his disability
determination is supported by substantial evidence.  *Brown,* 2010
WL 2606477, at *6; *see Aponte v. Sec'y, Dep't of Health & Human
Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) ("If the
[Commissioner's] findings are supported by substantial evidence,
the court must uphold the ALJ's decision to discount a
claimant's subjective complaints of pain.") (internal citations
omitted); *Alcantara,* 667 F. Supp. 2d at 277 ("[A]n evaluation of
a claimant's credibility is entitled to great deference if it is
supported by substantial evidence.").

When a claimant's symptoms demonstrate "a greater
severity of impairment than can be shown by the objective

medical evidence alone," the ALJ considers the following factors
in determining the claimant's credibility: (1) the claimant's
daily activities; (2) the location, duration, frequency, and
intensity of pain or other symptoms; (3) any precipitating and
aggravating factors; (4) the type, dosage, effectiveness, and
side effects of any medications taken; (5) other treatment
received; (6) other measures taken to relieve symptoms; and (7)
any other factors concerning the individual's functional
limitations and restrictions due to pain or other symptoms.  20
C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); *see*
*Alcantara,* 667 F. Supp. 2d at 277–78.  The ALJ must "consider
all of the evidence in the record and give specific reasons for
the weight accorded to the claimant's testimony," taking into
account the factors enumerated in 20 C.F.R. § 404.1529(c)(3).
*Alcantara,* 667 F. Supp. 2d at 277–78 (internal citations
omitted).

### D. **The Treating Physician Rule and Weight to be Afforded to Other Medical Evidence**

The regulations require that every medical opinion in
the administrative record be evaluated, "[r]egardless of its
source" when determining whether a claimant is disabled under
the Social Security Act.  20 C.F.R. §§ 404.1527(c), 416.927(c).
"Acceptable medical sources" that may evidence an impairment
include, *inter alia*, a claimant's licensed treating physicians

and licensed or certified psychologists.  *See* 20 C.F.R. §§
404.1513(a), 416.913(a).  Additionally, the Commissioner may
rely on "other sources", including social workers, to provide
evidence of "the severity of [a claimant's] impairment."  20
C.F.R. § 404.1513(d); *see Hernandez v. Astrue*, 814 F. Supp. 2d
168, 182 (E.D.N.Y. 2011).

　　　The "treating physician rule," codified by the SSA
regulations, instructs the Commissioner to give "controlling
weight" to a treating source's opinion "on the issue(s) of the
nature and severity" of a claimant's impairments as long as the
opinion is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] case record."  20 C.F.R.
§§ 404.1527(c)(2), 416.927(c)(2); *see also Schisler v. Sullivan*,
3 F.3d 563, 568 (2d Cir. 1993).  A treating physician receives
such deference because treating sources are "most able to
provide a detailed, longitudinal picture ... and may bring a
unique perspective to the medical evidence that cannot be
obtained from the objective medical findings alone or from
reports of individual examinations, such as consultative
examinations or brief hospitalizations."  20 C.F.R. §§
404.1527(c)(2), 416.927(c)(2).

　　　"By the same logic, the opinion of a consultative
physician, who only examined a plaintiff once, should not be

accorded the same weight as the opinion of a plaintiff's
treating psychotherapist." *Hernandez*, 814 F. Supp. 2d at 182-3
(internal quotation and citations omitted). This is because
"consultative exams are often brief, are generally performed
without the benefit or review of claimant's medical history and,
at best, only give a glimpse of the claimant on a single day."
*Id.*

        If the Commissioner denies the treating source's
opinion controlling weight, the regulations require the
Commissioner to "always give good reasons" for the weight given.
20 C.F.R. §§ 404.1527(c)(2); *see Schaal v. Apfel*, 134 F.3d 496,
505 (2d Cir. 1998) ("the Commissioner's failure to provide 'good
reasons' for apparently affording no weight to the opinion of
plaintiff's treating physician constituted legal error"); *see
also Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (the
"requirement of reason-giving exists, in part, to let claimants
understand the disposition of their cases, even – and perhaps
especially – when those dispositions are unfavorable"). "The
Commissioner will decide the weight of each opinion according to
the frequency of examination; the length, nature and extent of
the treatment relationship; and the supportability, consistency
and specialization of the opinion along with other relevant
factors." *Mullings v. Colvin*, 2014 WL 6632483, at *13; 20
C.F.R. §§ 404.1527(c), 416.927(c). If the Commissioner finds

that the treating physician's opinion should not be controlling, the Commissioner may rely on these factors in providing "good reasons" for such a finding. *Id.* When the Commissioner does not provide "good reasons," it is appropriate for the reviewing court to remand. *See Schaal*, 134 F.3d at 505.

### E. The ALJ's Affirmative Duty to Develop the Record

SSA regulations require that the Commissioner "make every reasonable effort" to assist the claimant in developing a "complete medical history." 20 C.F.R. § 404.1512(d). This Circuit has held that the "ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations and quotations omitted). It is therefore "the ALJ's duty to seek additional information from the [treating physician] *sua sponte*" when the claimant's medical record is inadequate. *Schaal*, 134 F.3d at 505. Furthermore, when a claimant proceeds *pro se*, the ALJ has a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990) (*citing Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).

The ALJ's affirmative duty to develop the record is appropriate in light of this Circuit's observation that "the

Social Security Act is remedial or beneficent in purpose, and
therefore, to be broadly construed and liberally applied."
*Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)
(internal quotations omitted).  The Act's "intent is inclusion
rather than exclusion."  *Marcus v. Califano*, 615 F.2d 23, 29 (2d
Cir. 1979).

### F. The Substantial Evidence Standard

A reviewing court may set aside the Commissioner's
decision if it is not supported by substantial evidence or is
based on legal error.  *McCall v. Astrue,* No. 05-cv-2042, 2008 WL
5378121, at *8 (S.D.N.Y. Dec. 23, 2008); *see Balsamo v. Chater,*
142 F.3d 75, 79 (2d Cir.1998).  When a reviewing court considers
the substantiality of the evidence, it must consider the whole
record, "because an analysis of the substantiality of the
evidence must also include that which detracts from its weight."
*Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d
Cir. 1988).  "Substantial evidence is 'more than a mere
scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'"  *Halloran v.
Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v.
Perales*, 402 U.S. 389, 401 (1971)).

## APPLICATION

### I. Improper Application of the Special Technique for Mental Impairments and Failure to Properly Consider Plaintiff's Testimony

In order to properly apply the "special technique" required for a disability determination of a claimant asserting mental impairments, the ALJ's decision must show "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 416.920a(e)(4). Although the ALJ enumerated and determined the severity of each of the four functional areas listed in 20 C.F.R. § 416.920a(c), he did not provide the requisite "specific findings" required to justify his ratings as to the degree of limitation in each of the four areas. *See Benjamin v. Astrue*, No. 11-CV-2074, 2013 WL 271505, at *5 (E.D.N.Y. Jan. 23, 2013); *see also Fait v. Astrue*, No. 10-CV-5407, 2012 WL 2449939, at *6 (E.D.N.Y. June 27, 2012) (finding that the ALJ's failure to justify his findings regarding the severity of the claimant's disability was improper application of the special technique and legal error that was cause for remand).

Instead, the ALJ attributed a level of severity for each of the four factors, briefly elaborated on the definition of the factor, and then offered generalized explanations without

substantive analysis. (Tr. 13-14.) Under the social

functioning factor, the ALJ found that "claimant's social

functioning is only mildly impaired" because "[a]lthough the

claimant demonstrates a tendency to be out of the public

directly rather than being involved in social activities he is

able to respond appropriately when spoken to and can initiate

conversation." (*Id.*) The ALJ does not, however, adequately

explain how he came to this or other determinations to support

his ratings. When evaluating plaintiff's restrictions on

activities of daily living and difficulties in concentration,

persistence and pace, the ALJ made brief reference to the

consultative evaluation performed by Dr. King, who treated

plaintiff on one occasion, but made no mention of the treating

physicians or social worker who regularly treated plaintiff.

(*Id.*) *Cf. Comins v. Astrue*, 374 F. App'x 147, 150 (2d Cir.

2010) (finding ALJ properly followed special technique when

decision "specifically expounded upon each of the four

functional areas of the special technique" and "[b]olstered by

evaluations from a variety of medical personnel ... he carefully

laid out the limitations [claimant] would be expected to have in

each area").

        District courts in this Circuit have found that it is

possible to find harmless error when the ALJ has failed to

properly apply the special technique. *See Kohler*, 546 F.3d at

269 (leaving "open the possibility than an ALJ's failure to adhere to the regulations' special technique might under other facts be harmless"); *see also Arguinzoni v. Astrue*, 2009 WL 1765252, at *8 (W.D.N.Y. June 22, 2009) (finding remand "not appropriate" to correct ALJ's "procedural error" in failing to properly apply the special technique because it was clear that "the ALJ would have arrived at the same conclusion ... if he adhered to the regulations" and "the medical opinion evidence ... supports the Commissioner's [ ] determination"). However, since the Second Circuit's decision in *Kohler*, "virtually every court in this Circuit that has encountered this issue ... has reversed and remanded the matter to the Commissioner for further proceedings," when confronted with noncompliance with 20 C.F.R. § 404.1520a. *Day v. Astrue*, No. 09-cv-131, 2011 WL 1467652, at *12 (E.D.N.Y. Apr. 18, 2011) (quoting *Concepcion v. Astrue*, No. 09-cv-1376, 2010 WL 2723184, at *11 (D. Conn. July 8, 2010)). Based on the record, the court cannot conclude that, had the ALJ complied with the special technique, the ALJ would have arrived at the same conclusion.

Here, for example, the ALJ did not address how plaintiff's auditory hallucinations, referenced throughout the record in both the hearing transcript and medical records, and resultant inability to sleep and self-imposed isolation from others, affected plaintiff's functioning regarding any of the

factors. (*See* Tr. 57, 74, 183, 250; 13.) Further, the ALJ did not explain why he wholly disregarded plaintiff's testimony regarding his symptoms and the effects on his ability to function. (Tr. 10-16). Instead, the ALJ cited only the consultative evaluation by Dr. King, which took place one month before plaintiff was referred for emergency evaluation at the RUMC Behavioral Health Center after reporting hearing voices to his primary care physician, and several months before plaintiff began regular treatment with a psychiatrist and therapist. Notably, aside from Dr. King's consultation, the records of plaintiff's mental health treatment are absent from the ALJ's analysis of plaintiff's mental impairments in the four functional areas. (Tr. 13.)

The ALJ only considered plaintiff's testimony regarding his symptoms in the context of determining plaintiff's RFC and noted that, despite the legitimacy and due consideration given to plaintiff's statements, the medical record did not support finding that plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms" were credible. (Tr. 14-15.) ("no symptoms or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental

impairment(s) that could reasonably be expected to produce the
symptoms.")  Even if the ALJ had considered plaintiff's
testimony in assessing the severity of his mental impairments,
the ALJ did not consider the factors listed in 20 C.F.R §
404.1529(c), which an ALJ must discuss when a claimant's
professed symptoms demonstrate a greater degree of severity of
impairment than what the objective medical evidence shows on its
own.  *See Alcantara*, 667 F. Supp. 2d at 277.  Absent the
requisite findings of the specific reasons for the ALJ's
credibility determination, remand is required.

## II.   Failure to Develop the Record

          It is the duty of the ALJ to fully and completely
develop the administrative record.  *See Gold v. Sec'y of HEW,*
463 F.2d 38, 43 (2d Cir. 1972));  *Rodriguez v. Barnhart,* No. 02-
CV-5782, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The
responsibility of an ALJ to fully develop the record is a
bedrock principle of Social Security law.") (*citing Brown v.
Apfel,* 174 F.3d 59 (2d Cir. 1999)).  Furthermore, because of
plaintiff's *pro se* status, the ALJ had a "heightened duty to
scrupulously probe into, inquire of, and explore for all the
relevant factors" when compiling the administrative record.
*Cruz*, 912 F.2d at 11 (*citing Echevarria*, 685 F.2d at 755).  This
heightened duty stems from the ALJ's duty to "protect the rights
of *pro se* litigant[s] by ensuring that all of the relevant facts

[are] sufficiently developed and considered." *Hankerson*, 636
F.2d at 895; *see Cruz*, 912 F.2d at 11.

An ALJ's obligation to obtain necessary medical
records includes an obligation to obtain a proper assessment of
the claimant's RFC. *See* 20 C.F.R. § 404.1513(b) (describing
"medical reports" as including "statements about what [a
claimant] can still do"). Because an RFC determination is a
medical determination, an ALJ who makes an RFC determination in
the absence of supporting expert medical opinion has improperly
substituted his own opinion for that of a physician, and has
committed legal error. *See Woodford v. Apfel,* 93 F.Supp.2d 521,
529 (S.D.N.Y.2000) ("An ALJ commits legal error when he makes a
residual functional capacity determination based on medical
reports that do not specifically explain the scope of claimant's
work-related capabilities."); *Zorilla v. Chater,* 915 F.Supp.
662, 666-67 (S.D.N.Y.1996) ("The lay evaluation of an ALJ is not
sufficient evidence of the claimant's work capacity; an
explanation of the claimant's functional capacity from a doctor
is required.").

Here, the ALJ did not adequately develop the record
because he did not rely on a proper assessment of plaintiff's
residual functional capacity. In assessing plaintiff's RFC, the
ALJ noted that "objective medical evidence of record offered in
support of this application is extremely sparse" and relied

almost exclusively on the findings of Dr. King, a consultative examiner. (Tr. 15.) Dr. King opined only "[i]n my opinion, the claimant has a satisfactory ability to follow simple instructions and perform simple tasks and a satisfactory ability to follow complex instructions, perform complex tasks, and interact with coworkers in a work setting." (Tr. 165.) The ALJ made a single reference to the opinions of plaintiff's social worker, Ms. Szoychen, with whom plaintiff met eleven times. (Tr. 16, 234-252.) The ALJ's only mention of plaintiff's treating physicians, Dr. Gamer and Dr. Dabaghian, who plaintiff saw 5 times and 6 times, respectively, appears in repeated reference to Dr. Gamer's diagnosis of "rule-out malingering." (Tr. 10-16, 218-287, 241-254.)

To the extent the ALJ observed an absence of available evidence regarding plaintiff's residual functional capacity, he bore an affirmative obligation to seek additional information and/or an RFC assessment from plaintiff's treating physicians. *See Batista v. Barnhart*, 326 F. Supp. 2d 345, 354 (E.D.N.Y.) (remanding case for further development of the record where ALJ "failed to obtain updated [RFC] assessments" from two of plaintiff's primary treating physicians).

Additionally, if an ALJ perceives possible ambiguities or "inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the

treating physician and to develop the administrative record accordingly." *Hartnett,* 21 F. Supp. 2d at 221 (E.D.N.Y. 1998) (cited in *Rosa,* 168 F.3d at 79). The ALJ's decision twice refers to a diagnosis of rule-out malingering as "notabl[e]," but does not provide an analysis or explanation of the significance of the diagnosis. (Tr. 15.) There is no evidence in the record that plaintiff's treatment providers determined that plaintiff was feigning his symptoms. In fact, the common meaning of a "rule-out"[20] diagnosis points to the opposite conclusion: that Dr. Gamer and Dr. Dabaghian found plaintiff was *not* feigning his symptoms. To the extent the ALJ's decision suggests that he inferred from the treaters' notations of "rule-out" diagnoses that plaintiff was indeed malingering, it was the duty of the ALJ to investigate the matter by obtaining further information from the doctor who made the diagnosis. The ALJ failed to do so. *See Rivera v. Barnhart,* 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) ("The ALJ's obligation to fully develop the record ... requires that he or she seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved.").

Finally, the ALJ does not reference plaintiff's March 22, 2011 visit to Dr. Dabaghian, at which the doctor noted that

---

[20] *See* definition of "rule-out" in medical context, *supra* note 15.

plaintiff was to have a follow-up with a psychiatrist regarding a schizoaffective disorder.  (Tr. 287.)  The medical records relating to this visit, which occurred after the hearing but prior to the ALJ's decision, appear in the list of exhibits considered.  (Tr. 20.)  This reference to a schizoaffective disorder is the only one in the record and differs from the diagnosis of Dr. King, who made no reference to a potential schizoaffective disorder and upon whose opinion the ALJ almost completely relied.  The court is unable to determine that the ALJ made affirmative efforts, as is required, to obtain more evidence about this potential disorder.  *See Gold*, 463 F.2d at 43.

Because the ALJ failed to take the requisite affirmative steps to complete the record that he found to be "extremely sparse," (Tr. 15), the case will be remanded with instructions to further develop and analyze the record. Particularly considering plaintiff's *pro se* status, the ALJ's failure to probe, inquire, explore, and explain the relevant facts is grounds for remand.

## CONCLUSION

For the foregoing reasons, the court denies the Commissioner's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

(1) Set forth specific reasons for the determinations and
    analysis regarding the factors relating to the degree of
    severity of plaintiff's mental impairment.

(2) Obtain additional information from plaintiff's treating
    physicians to the extent necessary to properly assess
    plaintiff's residual functional capacity.

(3) Request an explanation or clarification of Dr. Gamer's
    diagnosis of "rule-out malingering" and provide an analysis
    of its significance.

(4) Direct and assist the plaintiff in obtaining the medical
    opinion of the psychiatrist he saw for a schizoaffective
    disorder referenced by Dr. Dabaghian on March 22, 2011.


**SO ORDERED.**

Dated:  Brooklyn, New York
        December 3, 2015


                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York